**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ROGER WELDON, on behalf of | : | |
| himself and all others similarly situated, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:16-cv-783 (JCH) |
| | : | |
| v. | : | |
| | : | FEBRUARY 28, 2017 |
| MTAG SERVICES, LLC et al., | : | |
| Defendants. | : | |

**RULING RE: DEFENDANTS' MOTIONS TO DISMISS (DOC. NOS. 59 & 61)**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 2

II.   FACTS ......................................................................................................... 4

III.  LEGAL STANDARDS .................................................................................. 6

IV.   DISCUSSION .............................................................................................. 7

    A.  Article III Standing ................................................................................. 8

        1.  Count VI: Section 49-8 of the Connecticut General Statutes .................... 8

        2.  Other Standing Challenges................................................................. 14

            a.  Counts I, II.A–B, II.E, and IV: Conversion, CUTPA, and CCPA......... 15

            b.  Counts II.F–H and III: CUTPA and Abuse of Process Claims against Cazenovia................................................................................. 16

    B.  Litigation Privilege ............................................................................... 18

        1.  Governing Law................................................................................... 19

        2.  Application of the Litigation Privilege to Weldon's Claims........................ 21

    C.  Noerr-Pennington Doctrine .................................................................. 28

        1.  Governing Law................................................................................... 29

        2.  Application of Noerr-Pennington to Weldon's Claims .............................. 30

    D.  Count II.G: CUTPA Claim Grounded in Purchase of Liens for Purpose of Filing Suit .................................................................................................. 35

    E.  Count III: Abuse of Process .................................................................. 38

    F.  Count IV: CCPA Violations ................................................................... 40

    G.  Count V: Lien Discharge Claim for Violation of Sections 12-195g, 42a-9-513, and 42a-9-625 of the Connecticut General Statutes.................................................. 42

    H.  Count VI: Lien Discharge Claim for Violation of Section 49-8 of the Connecticut General Statutes.......................................................................................... 44

I.   Count VII: Unjust Enrichment ............................................................................ 44

V.   CONCLUSION............................................................................................... 47

## I.   INTRODUCTION

Plaintiff Roger Weldon ("Weldon") began this lawsuit against defendants MTAG Services, LLC ("MTAG"), Caz Creek CT, LLC ("Caz Creek"), and Cazenovia Creek Funding I, LLC ("Cazenovia") (collectively "defendants") by way of a class action complaint filed in state court, dated April 15, 2016.  See Class Action Compl. (Doc. No. 1-1) at 1.  MTAG removed the suit to federal court in May 2016, see generally Notice of Removal (Doc. No. 1), and Weldon subsequently filed an amended class action complaint, see generally First Am. Class Action Compl. ("FAC") (Doc. No. 51).

Weldon claims defendants engaged in wide-ranging, unlawful conduct related to their prosecution of municipal tax lien foreclosure actions.  See generally FAC ¶¶ 9–28. More specifically, Weldon alleges the following causes of action against various combinations of the defendants: (1) conversion ("Count I"), see FAC ¶¶ 100–07; (2) violations of the Connecticut Unfair Trade Practices Act ("CUTPA") ("Count II"), see FAC ¶¶ 108–81;[1] (3) abuse of process ("Count III"), see FAC ¶¶ 182–193; (4) violations

---

[1] Weldon's eight CUTPA claims are brought against the following defendants for the following allegedly deceptive and misleading conduct: (a) against MTAG and Caz Creek, for demanding and collecting payment on municipal tax liens they did not own ("Count II.A"), see FAC ¶¶ 108–15; (b) against Cazenovia, for "permit[ing], fail[ing] to disclose and thereby assist[ing], aid[ing] and abett[ing]" Caz Creek's and MTAG's demand and collection of payment on municipal tax liens they did not own ("Count II.B"), see FAC ¶¶ 116–124; (c) against all defendants, for demanding and collecting attorneys' fees ("Count II.C"), see FAC ¶¶ 125–34; (d) against all defendants, for demanding and collecting costs ("Count II.D"), see FAC ¶¶ 135–44; (e) against Caz Creek, for filing suit under a different name than was listed on its consumer collection agency license ("Count II.E"), see FAC ¶¶ 145–53; (f) against MTAG and Cazenovia, for engaging in debt collection without being licensed as Consumer Collection Agencies in Connecticut ("Count II.F"), see FAC ¶¶ 154–63; (g) against all defendants, for purchasing and taking assignment as a third party of tax liens for the purpose of filing tax lien foreclosure lawsuits ("Count II.G"), see FAC ¶¶ 164–72; (h) against all defendants, for demanding and collecting post-charge-off fees and costs ("Count II.H"), see FAC ¶¶ 173–81.

of the Connecticut Creditor Collection Practices Act ("CCPA") ("Count IV"), see FAC

¶¶ 194–220[2]; (5) violations of sections 12-195g, 42a-9-513, and 42a-9-625 of the

Connecticut General Statutes ("Count V"), see FAC ¶¶ 221–37; (6) violations of section

49-8 of the Connecticut General Statutes ("Count VI"), see FAC ¶¶ 230–37; and

(7) unjust enrichment ("Count VII"), see FAC ¶¶ 238–48.

Caz Creek and Cazenovia (collectively the "Caz Defendants") filed a Motion to

Dismiss the claims against them, see generally Caz Creek & Cazenovia's Mot. to

Dismiss Under Rules 12(b)(1) & 12(b)(6) ("Caz Motion") (Doc. No. 59); Mem. in Supp. of

Caz Creek & Cazenovia's Mot. to Dismiss First Am. Compl. Under Rules 12(b)(1) &

12(b)(6) ("Caz Mem. in Supp.") (Doc. No. 60), as did MTAG, see generally Def. MTAG

Svcs., LLC's Mot. to Dismiss Pl.'s First Am. Compl. ("MTAG Motion") (Doc. No. 61); Def.

MTAG Svcs., LLC's Mem. of Law in Supp. of its Mot. to Dismiss Pl.'s First Am. Compl.

("MTAG Mem. in Supp.") (Doc. No. 62).  Weldon opposed the Motions, see generally

Pl.'s Opp'n to Defs.' Mots. to Dismiss Pl.'s First Am. Class Action Compl. ("Opposition")

(Doc. No. 70), and defendants replied in a timely manner, see generally Def. MTAG

Svcs., LLC's Reply Mem. of Law in Supp. of its Mot. to Dismiss Pl.'s First Am. Compl.

("MTAG Reply") (Doc. No. 74); Reply Br. in Supp. of Caz Creek & Cazenovia's Mot. to

Dismiss First Am. Compl. Under Rules 12(b)(1) & 12(b)(6) ("Caz Reply") (Doc. No. 75).[3]

---

[2] Weldon has sued Cazenovia ("Count IV.A"), see FAC ¶¶ 194–202, Caz Creek ("Count IV.B"), see FAC ¶¶ 203–11, and MTAG ("Count IV.C"), see FAC ¶¶ 212–20, for overlapping, alleged violations of the CCPA.

[3] In the Motions and related briefing, the parties discuss only the merits of Weldon's claims—not those of any other, potential class members, as no class has yet been certified.  Therefore, this Ruling addresses only Weldon's individualized claims against MTAG, Caz Creek, and Cazenovia.  See Schweizer v. Trans Union Corp., 136 F.3d 233, 239 (2d Cir. 1998) ("'There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper Rule 12 motion to dismiss . . . simply because such a motion' precedes resolution of the issue of class certification." (quoting Lorber v. Beebe, 407 F. Supp. 279, 291 n.11 (S.D.N.Y. 1976)).

For the reasons set forth below, both Motions to Dismiss are **GRANTED IN PART AND DENIED IN PART**.

## II.     FACTS[4]

After Weldon did not pay his property taxes for several years, the City of Bridgeport imposed four municipal tax liens on his home.  The City assigned those liens to MTAG Caz Creek CT, LLC—which immediately assigned the liens it received to MTAG as its custodian—or directly to MTAG as custodian for MTAG Caz Creek CT, LLC; these assignments took place between 2012 and 2015.  See FAC ¶ 65.  At some point, MTAG Caz Creek CT, LLC changed its name to Caz Creek CT, LLC ("Caz Creek").  See FAC ¶ 66; FAC, Ex. 1 (Doc. No. 51-1) at 4 (listing Caz Creek's "Old Name" as "MTAG Caz Creek CT, LLC").  In August 2015, MTAG, in its custodial capacity, assigned the four liens to Cazenovia.  See FAC ¶ 66; FAC, Ex. 3 (Doc. No. 51-3) at 1–2, Schedule A at 2.

On October 19, 2015, MTAG, "as custodian for MTAG Caz Creek CT, LLC," filed a tax lien foreclosure lawsuit against Weldon in state court to collect on the liens.  See FAC ¶ 66; FAC, Ex. 5 (Doc. No. 51-5) at 1.  Defendants' standard-form state court

---

[4] For the purposes of ruling on the pending Motions to Dismiss, the court accepts as true all well-pled factual allegations in the FAC and draws all reasonable inferences in Weldon's favor.  See Carter v. Healthport Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016) (setting out standard for Rule 12(b)(1) motions challenging plaintiff's standing); Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (setting out same standard for Rule 12(b)(6) motions).  The court may consider the facts "as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  Indiaweekly.com, LLC v. Nehaflix.com, Inc., 596 F. Supp. 2d 497, 501 (D. Conn. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007)).  Furthermore, "courts routinely take judicial notice of documents filed in other courts, [ ] not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).  Therefore, the facts set forth above are drawn from the FAC, materials attached to or incorporated by reference by the FAC, and court documents from other cases.  This recitation is limited to setting forth those facts necessary to rule on the pending Motions to Dismiss.

foreclosure complaint ("State Complaint"), see FAC ¶¶ 14, 34, did not indicate that the liens had been assigned to Cazenovia, see FAC ¶ 61; see generally FAC, Ex. 5. Rather, materials attached to the filing expressly stated that "plaintiff as named in the [ ] complaint is the creditor to whom the debt is owed," FAC, Ex. 5 at 8 ¶ 2, and a Notice of Lis Pendens dated the same day as the State Complaint indicated that "MTAG Services, LLC, as Custodian for MTAG Caz Creek CT, LLC . . . is now the owner and holder of said liens," FAC, Ex. 5 at 11. The State Complaint demanded, inter alia, foreclosure of the lien, attorney's fees, interest, and costs. See id. at 6.

Weldon initially denied some of the allegations in the State Complaint, see Answer to Compl., Tax Lien Foreclosure Pleas of Def., Roger Wilmot Weldon (Doc. No. 71-1) at 1–2, but later asked that Caz Creek and MTAG inform him of the amount necessary to pay off the debts. See FAC ¶ 72. On December 31, 2015, Weldon provided a certified check for $25,463.23, id. ¶ 75, the amount that MTAG and Caz Creek had demanded by email, see id. ¶ 73. MTAG and Caz Creek withdrew the lawsuit the same day. See Caz Mem. in Supp., Ex. 2 (Doc. No. 60-2) at 1. MTAG and Caz Creek later refunded $375, see FAC ¶ 73, but the remaining $25,088.23 Weldon paid included charges for $1,100.00 of attorney's fees and $1,319.20 of costs, see FAC ¶ 74; FAC, Ex. 6 (Doc. No. 51-6) at 2.

On December 29, 2015, February 4, 2016, and March 23, 2016, Weldon demanded that defendants discharge the tax liens on his home for tax years 2010, 2011, 2012, and 2013, which were at that point paid in full. See FAC ¶ 82. Cazenovia filed a discharge of the 2011 and 2013 tax liens on February 4, 2016. See id. ¶ 83. For the 2010 and 2012 liens, Cazenovia filed a release dated June 16, 2016, which was

notated as received by the City of Bridgeport on July 13, 2016. <u>See</u> City of Bridgeport, CT Certificate of Release of Municipal Tax Liens (Doc. No. 71-2) at 1.

Neither MTAG nor Cazenovia are licensed Connecticut Consumer Collection Agencies. <u>See</u> FAC ¶ 10–11. Caz Creek is licensed as a consumer collection agency, as of November 18, 2015, under its current name, "Caz Creek CT, LLC." <u>See</u> FAC, Ex. 2 (Doc. No. 51-2) at 1. However, in the State Complaint it brought against Weldon, Caz Creek appears under its previous name, "MTAG Caz Creek CT, LLC." <u>See</u> FAC, Ex. 5 at 1. Each of defendants purchase municipal tax liens in order to collect on them by filing tax lien foreclosure lawsuits or by otherwise demanding payment. <u>See</u> FAC ¶ 10– 12.

## III.   LEGAL STANDARDS

When a motion to dismiss pursuant to Rule 12(b)(1) is "facial, <u>i.e.</u>, based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . , the plaintiff has no evidentiary burden." <u>Carter v. Healthport Techs., LLC</u>, 822 F.3d 47, 56 (2d Cir. 2016). Rather, the court must determine whether those allegations and exhibits constitute alleged "facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." <u>Id.</u> (quoting <u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 145 (2d Cir. 2011)). In making this determination, the court accepts as true all material allegations set forth in the Complaint and draws all reasonable inferences in favor of the plaintiff.[5]

---

[5] Though MTAG's Motion asks the court to dismiss Count VI of Weldon's FAC "[p]ursuant to [Federal Rule of Civil Procedure] 12(b)(6)," without reference to Rule 12(b)(1), MTAG Motion at 1, the portion of its Memorandum in Support that takes issue with Weldon's Article III standing properly invokes Rule 12(b)(1) as the grounds on which the court might dismiss that claim, MTAG Mem. in Supp. at 30. That being the case, the court construes MTAG's arguments for dismissal of Count VI under Rule 12(b)(1). <u>See</u> <u>All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.</u>, 436 F.3d 82, 88 n.6 (2d Cir. 2006)

The standard for ruling on a motion to dismiss pursuant to Rule 12(b)(6) is "substantively identical" to the standard for ruling on a motion pursuant to Rule 12(b)(1). See Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir. 2003), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014).  To survive a motion to dismiss for failure to state a claim, a complaint must contain factual allegations that, if accepted as true, state a plausible claim for relief. See, e.g., Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 65 (2d Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679)).  The court accepts as true the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor.  See, e.g., Lopez v. Jet Blue Airways, 662 F.3d 593, 596 (2d Cir. 2011) (citing, inter alia, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007)).

Notably, dismissals for lack of standing are without prejudice, Carter, 822 F.3d at 54–55, while dismissals for failure to state a claim are "adjudication[s] on the merits with preclusive effect," All. for Envtl. Renewal, Inc., 436 F.3d at 88 n.6.

## IV.   DISCUSSION

The court will address Weldon's overlapping claims against different combinations of defendants in the following manner.  First, the court will analyze defendants' assertions that Weldon lacks Article III standing to bring several of the

---

("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), the proper procedural route is a motion under Rule 12(b)(1)." (citations omitted)); Richards v. FleetBoston Fin. Corp., 427 F. Supp. 2d 150, 157 (D. Conn. 2006) (treating Motion to Dismiss pursuant to Rule 12(b)(6) for lack of standing as relying instead on Rule 12(b)(1)).

counts in the FAC.  Cf. Lujan v. Defs. of Wildlife, 504 U.S. 555, 569 (characterizing "standing inquiry" as "threshold" question).  Then, the court will discuss whether Weldon's claims are barred by the litigation privilege or by the Noerr-Pennington doctrine.  Last, the court will address the other grounds on which defendants ask for dismissal of those claims that survive the standing, litigation privilege, and Noerr-Pennington analyses.

> A.    Article III Standing

MTAG, Caz Creek, and Cazenovia all contend that Count VI—alleging violations of section 49-8 of the Connecticut General Statutes—should be dismissed because Weldon lacks standing.  See MTAG Mem. in Supp. at 30–32; Caz Mem. in Supp. at 31–32.  Caz Creek and Cazenovia, however, also challenge a number of other Counts in Weldon's FAC, on the grounds that he lacks standing to bring them.  See, e.g., Caz Mem. in Supp. at 11.  Weldon counters that he has standing to bring all of the claims in the FAC.  See generally Opposition at 40–45.  The court will first consider the standing challenges to Count VI, and then the standing arguments raised by Caz Creek and Cazenovia that do not relate to Count VI.

> 1.    Count VI: Section 49-8 of the Connecticut General Statutes

Section 49-8 of the Connecticut General Statutes ("Section 49-8") provides that lienholders "shall execute and deliver a release within sixty days from the date [of] a written request for a release of such encumbrance."  Conn. Gen. Stat. § 49-8(c).  Lienholders who do not release the lien within the requisite time period:

> shall be liable for damages . . . at the rate of two hundred dollars for each week after the expiration of such sixty days up to a maximum of five thousand dollars or in an amount equal to the loss sustained . . . as a result of the failure of the

[lienholder] to execute and deliver a release, whichever is greater, plus costs and reasonable attorney's fees.

Id.  Weldon argues that defendants' failure to release the 2010 and 2012 tax liens within sixty days of his December 31, 2015 payment runs afoul of this provision.  See FAC ¶ 235.

MTAG contends that Weldon lacks a cognizable injury for standing purposes both because the liens had already been released by the time he asserted that it violated Section 49-8, and because this "bare procedural violation" does not qualify as a "concrete harm."  See MTAG Mem. in Supp. at 28–29.  Similarly, the Caz Defendants suggest that, even if Section 49-8 applies to the liens at issue, Weldon suffered no injury because the foreclosure case was dismissed the same day he made payment, and thus he never "lack[ed] evidence that the liens were discharged."  See Caz Mem. in Supp. at 31–32.  Weldon responds that Section 49-8 creates a statutory "right to a timely filed release of lien," the violation of which creates a cognizable injury.  See Opposition at 44–45.

It is well-established that the United States Constitution's "case-or-controversy requirement[ ] consists of three elements: (1) an 'injury in fact,' by which is meant 'an invasion of a legally protected interest'; (2) 'a causal connection between the injury and the conduct complained of'; and (3) a likelihood that 'the injury will be redressed by a favorable decision.'"  Fulton v. Goord, 591 F.3d 37, 41 (2d Cir. 2009) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).  "To demonstrate injury in fact, a plaintiff must show the 'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  Strubel v. Comenity Bank, 842 F.3d 181, 188 (2d Cir. 2016) (quoting Lujan, 504 U.S. at 560).

Here, Weldon satisfies the legal-interest requirement of injury in fact: Count VI affirmatively and plausibly alleges a violation of Section 49-8.  The Second Circuit and Supreme Court have made clear that Congress may, by statute, create new legal rights, such that violation of the statute would support an individual plaintiff's standing.  See Strubel, 842 F.3d at 188 (citing, inter alia, Warth v. Seldin, 422 U.S. 490, 500 (1975)).  However, "it is an open question in the Second Circuit whether a state statute can define a concrete injury for the purposes of Article III standing."  Jaffe v. Bank of Am., N.A., 13 CV 4866 (VB), 14 CV 947 (VB), 2016 WL 3944753, at *3 (S.D.N.Y. July 15, 2016) (citing Ross v. AXA Equitable Life Ins. Co., 115 F. Supp. 3d 424, 434 (S.D.N.Y. 2015)); see also Bellino v. JPMorgan Chase Bank, N.A., No. 14-cv-3139 (NSR), 2016 WL 5173392, at *6 (S.D.N.Y. Sept. 20, 2016).  At least three other circuits have suggested that state statutes can recognize cognizable injuries for Article III standing purposes.  See Jaffe, 2016 WL 3944753, at *4 (citing opinions from Seventh, Ninth, and Tenth Circuits).  Neither MTAG nor the Caz Defendants argue against standing on the grounds that state, as opposed to federal, statutes cannot create new legal rights.  Indeed, as the Ninth Circuit has pointed out, if state law could not create interests that support standing in federal courts, "there would not be Article III standing in most diversity cases."  See Cantrell v. City of Long Beach, 241 F.3d 674, 684 (9th Cir. 2001).  The reasoning of the other circuit courts, as well as other district courts within this Circuit, is persuasive.  Therefore, this court concludes that violations of state statutes satisfy the legal-interest requirement of injury in fact.

Next, the court turns to the more difficult question of whether Weldon's purported injury is sufficiently "concrete and particularized" to give rise to standing.  In Spokeo,

<u>Inc. v. Robins</u>, 136 S. Ct. 1540 (2016), the Supreme Court clarified the types of harms derived from procedural violations that qualify as "concrete."  <u>See generally</u> 136 S. Ct. at 1549–50.  The Second Circuit, just a few months ago, interpreted <u>Spokeo</u> in a context similar to the facts of this case.  <u>See generally</u> <u>Strubel</u>, 842 F.3d 181.[6]  The Supreme Court made clear in <u>Spokeo</u> that certain intangible harms may qualify as concrete injuries, while also underscoring that the legislature's decision to grant a statutory right and authorize suit to enforce that right does not, without more, give rise to standing.  <u>See id.</u> at 188–89 (citing <u>Spokeo</u>, 136 S. Ct. at 1549).  In determining whether a procedural violation "manifests injury in fact, a court properly considers whether [the legislature] conferred the procedural right in order to protect an individual's concrete interests."  <u>Id.</u> at 189.  Ultimately, the Second Circuit summarized <u>Spokeo</u>'s main holding as follows:

> [W]e understand <u>Spokeo</u>, and the cases cited therein, to instruct that an alleged procedural violation can by itself manifest concrete injury where [the legislature] conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a 'risk of real harm' to that concrete interest. But even where [the legislature] has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest.

<u>Id.</u> at 190 (citations omitted).

After <u>Spokeo</u> there appears to be a division among the federal courts as to whether claims alleging violations of mortgage discharge statutes should, absent some financial harm, be dismissed for lack of standing.  <u>Compare</u> Opposition at 44

---

[6] Though the parties did not have the benefit of <u>Strubel</u> in briefing the Motions to Dismiss, the Second Circuit's opinion goes a long way toward clarifying many the challenging standing issues related to Count VI.

(discussing Jaffe, 2016 WL 3944753), and Letter from Joseph S. Tusa, Pl.'s Counsel, to Judge Janet C. Hall (Doc. No. 73) (discussing Bellino, 2016 WL 5173392), with Notice of Supp. Authority in Further Supp. of Def. MTAG Servs., LLC's Mot. to Dismiss Pl.'s First Am. Compl. (Doc. No. 76) at 1–2 (discussing Nicklaw v. CitiMortgage, Inc., -- F.3d --, 2016 WL 5845682 (11th Cir. Oct. 6, 2016)).  Notably, all of these cases predate the Second Circuit's precedential ruling in Strubel.  The passage block-quoted above makes clear that an alleged procedural violation can, even without any other factual allegations, give rise to a sufficiently concrete injury for standing purposes, when the procedural violation presents a real risk of harm to the plaintiff's interests.  See Strubel, 842 F.3d at 190.  Here, there is no dispute that Weldon has alleged a violation of the procedural protections in Section 49-8.[7]

The only remaining question, then, is whether the Connecticut legislature conferred the procedural right in Section 49-8 to protect Weldon's concrete interests, such that violation of Section 49-8 presented a risk of real harm to those interests. Notwithstanding the Eleventh Circuit's non-binding opinion to the contrary, the court concludes that Weldon has sufficiently alleged an Article III injury.  Section 49-8 is clearly designed to ensure that title is cleared shortly after the lienholder receives satisfaction of the debt he holds.  See Conn. J. Standing Comm. Hearings, Judiciary, 1995, Pt. 6, at 2001 (statement of David L. Hemond, Chief Att'y, Conn. L. Revision

--------------------------------

[7] The Caz Defendants' Memorandum in Support might be read to suggest that each of the four liens on Weldon's home were, in fact, released in a timely manner, but that the certificate memorializing their release contained two errors.  See Caz Mem. in Supp. at 31.  Whether or not this is the proper way to understand the Caz Defendants' Memorandum, the court is obligated to accept as true Weldon's factual contention that "[d]efendants did not discharge or release the 2010 and 2012 municipal tax liens they purchased related to [p]laintiff's home within sixty days from December 31, 2015, or from the dates of his subsequent demands," FAC ¶ 235.

Comm'n) ("The failure of lenders to provide timely releases also directly increases the risks and costs attendant in real estate transactions.  [This Act] is intended to address these difficulties by increasing the incentives to assure that lenders comply with laws requiring releases and by enhancing the remedies and options available to mortgagors and attorneys when lenders fail to comply."); Bellemare v. Wachovia Mortg. Corp., 284 Conn. 193, 202 (2007) ("[T]he cause of action created by § 49-8 is akin to an action for slander of title . . . [which] is a tort whereby the plaintiff's claim of title to land or other property is disparaged . . . ." (citations, quotation marks, and alterations omitted)).

The alleged failure of defendants to release the liens clearly posed a risk of real harm to the interest in clear title that Section 49-8 is designed to protect.  See Bellemare v. Wachovia Mortg. Corp., 94 Conn. App. 593, 604–05 (2006) (quoting and discussing legislative history) (remarking that "the legislative history and statutory scheme of § 49-8 establish that the statute was enacted and continues . . . to protect property owners . . .," as well as to enhance marketability of title).  Clouded title to Weldon's Bridgeport home could quite realistically have hurt him if, for example, he had tried to sell the house or take out a loan.  The fact that Weldon may have been aware of the dismissal of the state foreclosure lawsuit, see Caz Mem. in Supp. at 31, does nothing to diminish the cloud on the title to Weldon's home that remained, absent a formal release of the liens.

Therefore, Weldon has alleged a concrete and particularized, legally-protectable injury in fact sufficient to support his standing to assert Count VI.[8]  However,

―――――――――――――――――

[8] MTAG misleadingly cites Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998), for the proposition that "parties may not sue to assess penalties for past violations corrected before a claim was asserted."  MTAG Mem. in Supp. at 28.  There, in the portion of the court's opinion to which MTAG

notwithstanding this conclusion, the standing issue may be raised at a later stage of this litigation, with the burden remaining on the plaintiff.  See Carter, 822 F.3d at 56.

2.     Other Standing Challenges

Although MTAG does not assert standing challenges to any other claim in the FAC, the Caz Defendants argue that Weldon lacks standing to pursue Count I, see Caz. Mem. in Supp. at 25, Counts II.A–B, see id. at 11–12, Counts II.E–H, see id. at 17–18, 21 n.10, Count III, see id. at 29, and Count IV, see id. at 22–23.  As noted above, the United States Constitution requires that a plaintiff suffer an injury in fact, that there is a causal connection between the injury and the conduct of which the plaintiff complains, and that there be a likelihood that the injury will be redressed if the court rules as the plaintiff asks.  See Fulton, 591 F.3d at 41.  The Supreme Court has cautioned that courts must not "confuse weakness on the merits with absence of Article III standing." Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2663 (2015) (quoting Davis v. United States, 564 U.S. 229, 249 n.10 (2011)).  As was the case for the challenges to Count VI, the Caz Defendants' challenges to these other Counts focus primarily on the injury prong of the standing analysis.

---

appears to refer, the Supreme Court rejected the respondent's claims to standing grounded in the imposition of civil penalties on petitioner.  The civil penalties in Steel Co. were payable to the United States Treasury and thus could not possibly redress respondent's "own injury—reimbursement of the costs it incurred . . . ."  Steel Co., 523 U.S. at 106.  Here, by contrast, any payout Weldon receives for violations of Section 49-8 will be his gain, not that of any government entity.

It also bears emphasizing that, to the extent MTAG suggests Weldon's injury is negated by the fact that his liens have now discharged, see MTAG Mem. in Supp. at 28, Weldon's claims are best read as demanding damages for the past violation of his statutory rights.  There is no requirement that an Article III injury be ongoing or prospective, when a plaintiff demands monetary damages.  See City of Los Angeles v. Lyons, 461 U.S. 95, 109, 111 (1983) (noting that plaintiff "still [had] a claim for damages against the City that appears to meet all Article III requirements," despite holding that he did not have standing to pursue equitable relief where he did not "show[ ] . . . any real or immediate threat that [he would] be wronged again").  Weldon's FAC demands monetary relief—which he has not yet received from defendants—for the alleged statutory lien release violation.  Such a backward-looking claim is entirely permissible, as far as standing analysis is concerned.

The Caz Defendants' arguments that Weldon lacks standing to assert these claims are unfortunately scattered and often difficult to parse.[9]  However, they appear grounded in two, related arguments: (1) as to Counts I, II.A–B, II.E, and IV, Weldon has suffered no injury because he indisputably owed money on his taxes, and he ultimately received the discharge of the liens for which he paid; and (2) as to Counts II.F–H and III, Weldon cannot sue Cazenovia on behalf of other plaintiffs, when Cazenovia itself did not sue Weldon.[10]

> a.  Counts I, II.A–B, II.E, and IV: Conversion, CUTPA, and CCPA

As noted above, the Caz Defendants argue that Weldon did not suffer any injury by virtue of paying Caz Creek and MTAG instead of Cazenovia.  See Caz Mem. in Supp. at 11–12 (Count II.A–B), 17 (Count II.E), 22–23 (Count IV), 25 (Count I).  Weldon responds that his injury is apparent from the collection and retention of payments by parties who had no legal right to them.  See, e.g., Opposition at 42.

The rule that courts must not confuse the merits of a claim with the question of whether the plaintiff has standing to assert it is particularly important here: in deciding whether, for example, Weldon has standing to assert a CUTPA claim against the Caz Defendants, the court must not consider the merits of the underlying claim.  See Ariz. State Legislature, 135 S. Ct. at 2663.  Moreover, even when a damages claim may ultimately be defeated by the fact that an injury is outweighed by other benefits, the

---

[9] Indeed, the Caz Defendants appear often to conflate the Article III injury in fact requirement with the "ascertainable loss" requirement for raising a CUTPA claim.  See, e.g., Caz Mem. in Supp. at 11 ("Nor did Weldon suffer an ascertainable loss or Article III injury-in-fact because he received exactly what he paid for: dismissal of the Foreclosure Case and discharge of the tax liens.").

[10] To the extent there is overlap among these categories, the court's analysis below of each contention should not be read as mutually exclusive.

plaintiff still has standing to assert that claim.  See Ross v. Bank of Am. N.A. (USA), 524

F.3d 217, 222 (2d Cir. 2008); accord 13A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 3531.4 (3d ed. Apr. 2016 Update) ("Once injury is

shown, no attempt is made to ask whether the injury is outweighed by benefits the

plaintiff has enjoyed from the relationship with the defendant.").

Whether or not Weldon's claims in Counts I, II.A–B, II.E, and IV ultimately have

merit, he has standing to assert them.  It is sufficient that he alleges that MTAG and Caz

Creek, with the help or acquiescence of Cazenovia, demanded and received money to

which they had no right.  Nor is it of any import that Weldon eventually received the

benefit—discharge of the liens—for which he paid.  The court must determine whether a

party's wrongful demand for and receipt of money gives rise to injury in fact, without

regard to any benefit ultimately conferred upon Weldon, see Ross, 524 F.3d at 222.

Clearly, such action, if in violation of state law, would give rise to an injury.  Financial

harm is the paradigmatic Article III injury.  Weldon has properly alleged constitutional

injury in fact for Counts I, II.A–B, II.E, and IV.

> b.    Counts II.F–H and III: CUTPA and Abuse of Process Claims
>        against Cazenovia

The Caz Defendants contend that Weldon's claims in Counts II.F–H and III must

be dismissed for lack of standing because they require that Cazenovia have participated

in the state suit as a named party.  See Caz Mem. in Supp. at 18 & n.8 (Counts II.F–G),

21 (Count II.H), 29 (Count III).  Weldon appears not to respond to this argument.  See

generally Opposition at 40–45.

In Mahon v. Ticor Title Insurance Company, 683 F.3d 59 (2d Cir. 2012), the

Second Circuit rejected a putative class action plaintiff's argument that Article III posed

16

no obstacle to suing defendants who did not injure her individually, so long as she sued other, related defendants who had injured her.  See 683 F.3d at 65–66.

In this case, Weldon alleges in Count II.F that Cazenovia was "required to be [a] licensed consumer collection agenc[y]," but "engaged in debt collection within Connecticut in the form of filing tax lien foreclosure lawsuits without obtaining a Consumer Collection Agency License."  FAC ¶ 159 (emphasis added).[11]   Because Weldon has not alleged that Cazenovia filed any tax lien foreclosure lawsuit against him, see FAC ¶ 13 (alleging that "Caz Creek and MTAG filed a tax lien foreclosure action against Plaintiff in the Connecticut state courts"), he could not possibly have been injured by Cazenovia's alleged institution of tax lien foreclosure suits while failing to comply with state licensing requirements.  Moreover, as discussed above, Weldon does not have standing to assert claims on behalf of other members of his putative class against related defendants where he does not have standing to bring such claims himself.  See Mahon, 683 F.3d at 65–66.  Therefore, Cazenovia's Motion to Dismiss Count II.F, insofar as it alleges a claim against Cazenovia, is granted for the reasons discussed above and because Weldon has not opposed dismissal.

By contrast, Counts II.G, II.H, and III do not require that Cazenovia be the party to file suit.  These counts all allow for the possibility that Cazenovia acted unlawfully in actively assisting MTAG and Caz Creek in filing suit, rather than requiring that Cazenovia itself filed suit.  See, e.g., FAC ¶ 171 (asserting, in Count II.G, that MTAG

_____

[11] Though similar language appears in several of Weldon's other claims against Cazenovia, see, e.g., FAC ¶ 179, the gravamen of these counts as they pertain to Cazenovia is that Cazenovia has assisted MTAG and/or Caz Creek in their institution or prosecution of the tax lien foreclosure suits.  As such, they do not suffer from the same defect as Count II.F, which relies on the theory that it is misleading for an unlicensed consumer collection agency to file a debt collection suit.  See generally FAC ¶¶ 154–63.

and Caz Creek acted "on behalf of and in cooperation with Cazenovia Funding"). Again, for the purposes of standing, the court does not inquire into the merits of these claims, but rather asks only if Weldon has plausibly alleged he was injured by Cazenovia.  Because he has put forth factual contentions that plausibly suggest Cazenovia acted in concert with the other defendants, and because it is unnecessary for Counts II.G, II.H, and III that Cazenovia be a party to the state lawsuit, Weldon has Article III standing to pursue these claims.

       B.    <u>Litigation Privilege</u>

Next, the court addresses defendants' arguments that many of Weldon's claims are barred by Connecticut's litigation privilege.  The defendants argue that, because these claims rely on alleged falsehoods during prior state litigation, those communications are absolutely privileged and cannot serve as bases for liability.  <u>See</u> Caz Mem. in Supp. at 8 ("Here, in the Counts at issue, Weldon is complaining solely about the Foreclosure Case and communications allegedly made in connection with it."); MTAG Mem. in Supp. at 10–11 ("The crux of [p]laintiff's allegations is that MTAG purportedly filed a foreclosure lawsuit on behalf of the wrong entity and sought fees and costs that the foreclosure plaintiff could not have obtained in that lawsuit.").

Weldon counters that the litigation privilege is inapplicable for five reasons: first, because Cazenovia was not a party to the state lawsuit and still seeks to invoke the privilege; second, because claims for abuse of process are not subject to the litigation privilege; third, because the litigation privilege "cannot be used as a shield against statutes whose purpose is intended to avoid abuse during litigation"; fourth, because the litigation privilege does not apply to unlawful acts outside of litigation; and fifth, because

18

repetitive violations committed as part of normal business practices are not subject to the privilege.  See Opposition at 45 (emphasis omitted).  As discussed below, Weldon's arguments against application of the privilege are, for the most part, without merit.  The court therefore dismisses many of Weldon's claims as barred by Connecticut's litigation privilege.

       1.    Governing Law

Federal courts in Connecticut routinely apply the state's litigation privilege to claims that challenge representations made in underlying state court litigation.  See, e.g., Omotosho v. Freeman Inv. & Loan, 136 F. Supp. 3d 235, 250–51 (D. Conn. 2016); Pellechia v. OneWest Bank, FSB, No. 3:11–CV–1587 (JCH), 2013 WL 1131609, at *3 (D. Conn. Mar. 18, 2013).  "It is black letter law in Connecticut that, 'there is an absolute privilege for statements made in judicial proceedings.'"  Spector v. Bd. of Trs. of Cmty.-Tech. Colls., 463 F. Supp. 2d 234, 255 (D. Conn. 2006) (quoting Petyan v. Ellis, 200 Conn. 243, 245 (1986)).  This protection applies to any "communications uttered or published in the course of judicial proceedings . . . so long as they are in some way pertinent to the subject of the controversy."  Dina v. Cuda & Assocs., 950 F. Supp. 2d 396, 407 (D. Conn. 2013) (quoting Derisme v. Hunt Leibert Jacobson PC, 880 F. Supp. 2d 311, 337 (D. Conn. 2012)).  Protected statements may be made in "pleadings or other documents prepared in connection with a court proceeding.  Id. (quoting Derisme, 880 F. Supp. 2d at 337).  However, "[t]he scope of privileged communication extends not merely to those made directly to a tribunal, but also to those preparatory communications that may be directed to the goal of the proceeding."  Hopkins v. O'Connor, 282 Conn. 821, 832 (2007).

Connecticut case law makes clear that the litigation privilege is broad: it provides protection even for allegedly fraudulent statements made in the course of litigation.  See Simms v. Seaman, 308 Conn. 523, 548–549 (2013); Tyler v. Tatoian, 164 Conn. App. 82, 92–93 (2016).  But see MacDermid, Inc. v. Leonetti, 310 Conn. 616, 639 (2013) (making clear that Connecticut has not "adopt[ed] a litigation privilege [that] protect[s] all conduct associated with judicial proceedings").  Both federal and state courts have applied the Connecticut litigation privilege to CUTPA claims.  See, e.g., Dina, 950 F. Supp. 2d at 407–408 (quoting Walsh v. Law Offices of Howard Lee Schiff, P.C., No. 3:11-cv-1111 SRU, 2012 WL 4372251, at *7 (D. Conn. Sept. 24, 2012)); Tyler, 164 Conn. App. at 93–94.

Though the Connecticut Supreme Court has recognized certain torts that are not barred by the litigation privilege, those exceptions—allowing causes of action premised on misstatements during the course of litigation—are few.  See Simms, 308 Conn. at 547 (discussing torts of vexatious litigation and abuse of process).  The crux of those claims that are exempt from the privilege is that they are grounded in "conduct that subverts the underlying purpose of the judicial process.  Specifically, these causes of action prevent, or hold an individual liable for, the improper use of the judicial process for an illegitimate purpose, namely, to inflict injury upon another individual in the form of unfounded actions."  MacDermid, Inc., 310 Conn. at 631 (citing DeLaurentis v. City of New Haven, 220 Conn. 225, 264 (1991)).

The litigation privilege exists because "in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements."  MacDermid, Inc., 310 Conn.

20

at 627.  "[S]afeguards other than civil liability exist to deter or preclude" misconduct during litigation: litigants may file a motion to open the judgment, or may file a grievance against the offending attorney.  See Simms, 308 Conn. at 552.  "Parties or their counsel who behave outrageously are [also] subject to punishment for contempt of the court." See Tyler, 164 Conn. App. at 92–93 (quoting DeLaurentis, 220 Conn. at 264).

Finally, the Connecticut Supreme Court has emphasized that it "has sought to ensure that the conduct that absolute immunity is intended to protect, namely, participation and candor in judicial proceedings, remains protected regardless of the particular tort alleged in response to the words used during participation in the judicial process."  MacDermid, 310 Conn. at 628.  It referred approvingly to "commentators [who] have observed that, because the privilege protects the communication, the nature of the theory on which the challenge is based is irrelevant."  Id. (quoting Simms, 308 Conn. at 549).

2.      Application of the Litigation Privilege to Weldon's Claims

In deciding whether each of Weldon's claims are barred by the litigation privilege, the core question is whether he seeks to impose liability for statements made during the prior litigation.  However, before addressing the applicability of the litigation privilege to Weldon's claims, the court will take up Weldon's arguments against applying the privilege.

First, the court rejects Weldon's argument that Cazenovia cannot claim the benefits of the privilege.  As noted above, the Connecticut Supreme Court makes clear that communications uttered in the course of litigation are protected by the privilege, irrespective of the theory put forth to support the alleged liability.  See id.  Weldon has

21

clarified that he believes that Cazenovia not only "aid[ed] and abet[ted]" MTAG's and Caz Creek's conduct, see FAC ¶ 122, but provided "direct assistance to MTAG and Caz Creek," Opposition at 18.  Weldon cannot have it both ways: either Cazenovia was intimately involved in the prosecution of the tax lien foreclosure action, or it was not. Ultimately, his claims are best read as alleging that Cazenovia actively engaged and participated in much of the alleged litigation misconduct.  As such, it would make little sense to rule that Cazenovia is not protected by the litigation privilege because it was not a party to the state litigation, while holding it liable for its involvement in aiding other defendants in bringing the litigation.  It is sufficient that Weldon has alleged Cazenovia's active assistance in the state case for the litigation privilege to apply to Cazenovia.

Second, Weldon's suggestion that claims grounded in statutes intended to combat abuse during litigation are exempt from the litigation privilege is, for the most part, unavailing.  The court has already noted several examples of courts rejecting CUTPA claims as barred by the litigation privilege, see supra Part IV.B.1, undermining any argument that CUTPA claims are generally exempt from the litigation privilege. Weldon's arguments regarding CUTPA claims grounded in other statutes are similarly unavailing.  While it might be the case that CUTPA claims resting on violations of statutes that are designed to "combat abuse during litigation," see Opposition at 48, would be exempt from the privilege, there is no indication that sections 12-193, 36a-801, 805(a)(3), and 805(a)(12) of the Connecticut General Statutes were enacted for such a purpose.  In determining whether a cause of action should be exempt from the privilege, it is instructive to look at those that have been ruled exempt by the Connecticut Supreme Court: the paradigmatic examples are the torts of vexatious

litigation and abuse of process.  See Simms, 308 Conn. at 546–47.  Unlike those

causes of action, Weldon provides no support for a conclusion that violations of statutes

governing consumer collection agencies are similarly designed to prevent parties from

using litigation for entirely unrelated ends.[12]  Last, the court refrains from deciding in the

first instance whether CCPA claims are entirely exempt from the litigation privilege.

Weldon offers only a statement articulated in dicta, from a Superior Court case, see

Jonas v. Delallo, No. CV105029297S, 2012 WL 6846396, at *10 (Conn. Super. Ct. Dec.

11, 2012), as support for this argument.  However, because the court finds that the

CCPA claims are subject to dismissal on other grounds, see infra Part IV.F, it need not

reach the issue of whether these claims are exempt from the litigation privilege or

Noerr-Pennington doctrine, cf. Davis v. Hunt Leibert Jacobson P.C., No. 3:12cv1102

(JBA), 2016 WL 2963418, at *12 n.27 (D. Conn. May 20, 2016) (declining to rule

whether CCPA claims were barred by absolute immunity, where dismissal was proper

on other grounds).[13]

Third, Weldon relies extensively and exclusively on Passaro-Henry v. Allstate

Ins. Co., No. 3:10–cv–450 (JCH), 2010 WL 5174405 (D. Conn. Dec. 15, 2010), to

---

[12] The cases Weldon cites in support of his assertion that these statutes were designed to combat abuse during litigation are inapposite.  In Milford Tax, LLC v. Paradigm Milford, No. CV146015774S, 2015 WL 3875386 (Conn. Super. Ct. May 28, 2015), the Superior Court rejected a party's attempts under section 12-193 of the Connecticut General Statutes to collect fees incurred in the course of an unrelated action.  See 2015 WL 3875386, at *2–*3.  Though the court certified a CUTPA class in Petrolito v. Arrow Fin. Servs., LLC, 221 F.R.D. 303 (D. Conn. 2004), it made clear that it would not rule on the merits of the claim at the class certification phase, and did not discuss the litigation privilege at all.  See 221 F.R.D. at 308.  Last, contrary to Weldon's assertion, Opposition at 48, the court in Fields v. W. Mass. Credit Corp., 479 F. Supp. 2d 287 (D. Conn. 2007), did not grant summary judgment to the plaintiff on a CUTPA claim, see 479 F. Supp. 2d at 287 n.1 ("I deny the motion for summary judgment without prejudice with respect to Count 2, the CUTPA claim.  In her summary judgment papers, [plaintiff] has not indicated why summary judgment is appropriate on the CUTPA claim.").

[13] In light of the court's decision that Weldon's CCPA claims fail on other grounds, it expresses no opinion as to the applicability or inapplicability of the litigation privilege or Noerr-Pennington doctrine to the claims in Count IV.

23

support his contention that repetitive unlawful actions not incidental to a defendant's business do not receive protection from the litigation privilege.  See Opposition at 49.  This reliance is misplaced, as the plaintiff in Passaro-Henry alleged that Allstate routinely filed suits against healthcare professionals for an improper purpose unrelated to the underlying litigation.  See 2010 WL 5174405, at *9 (noting plaintiff's allegation that defendant engaged in "pattern of frivolous lawsuits in order to dissuade healthcare professionals from submitting claims").  Here, by contrast, there is no plausible allegation that defendants brought the litigation for an improper purpose, such as to interfere with any of Weldon's interests not related to the tax liens.  Cf. id. at *10 (discussing Roncari Dev. v. GMG Enters., Inc., 45 Conn. Supp. 408, 409–10 (1997), in which defendants filed anticompetitive, "allegedly frivolous challenge to the plaintiff's permit to construct a competing valet parking facility").

Fourth, Weldon argues that communications predating the institution of the state suit, as well as those not included in court filings, are unprotected.  However, the Connecticut Supreme Court has made clear that even "preparatory communications . . . directed to the goal of the proceeding" receive the benefit of the litigation privilege.  See Hopkins, 282 Conn. at 832.  Here, it appears that the Notice of Lis Pendens was prepared in furtherance of the state foreclosure lawsuit; indeed, it was appended to the complaint that began that suit.  See FAC ¶ 64.  Though at least one court hesitated to extend the litigation privilege to the filing of a lis pendens, its reasoning was grounded in a belief that it could not do so until "directed to do so by an appellate court."  See Constantinou v. Westbrook Assocs., No. 537757, 1997 WL 176315, at *3 (Conn. Super. Ct. Mar. 27, 1997).  More recently, Connecticut courts have applied an absolute

litigation privilege to lis pendens filings.  See Chamerda v. Opie, No. CV136037328, 2015 WL 493446, at *4 n.1 (Conn. Super. Ct. Jan. 13, 2015) (collecting "persuasive Superior Court authority").  In this case, where the lis pendens was prepared in contemplation of imminent litigation, it is absolutely privileged, in accordance with the more recent Connecticut case law.

Weldon's suggestion that defendants' out-of-court collection demands are unprotected is also erroneous.  It is abundantly clear that privileged communications need not be "made directly to a tribunal," Hopkins, 282 Conn. at 832, so long as they are "pertinent to the subject of the controversy," Dina v. Cuda & Assocs., 950 F. Supp. 2d 396, 407 (D. Conn. 2013) (quoting Derisme v. Hunt Leibert Jacobson PC, 880 F. Supp. 2d 311, 337 (D. Conn. 2012)).  Thus, the settlement communications alleged in Weldon's FAC, see FAC ¶¶ 74, 80, fall squarely within the protection of the privilege.

The court agrees with Weldon's arguments against application of the privilege on two, specific points.  First, to the extent defendants seek to invoke the protection of the litigation privilege for its conduct, rather than its representations during the course of litigation, they are not so entitled.  See MacDermid, 310 Conn. at 628–29 ("[C]ommentators have observed that[ ] the privilege protects the communication . . . ." (citation omitted)).

Second, Weldon's abuse-of-process claims (Count III) are not barred by the litigation privilege.  Indeed, the tort of abuse of process is one of the few causes of action specifically identified by the Connecticut Supreme Court as being exempt from the privilege.  See id. at 633 (characterizing abuse of process as "a tort which [ ] falls outside the scope of absolute immunity").  However, insofar as Weldon has sprinkled

25

abuse of process allegations into his other substantive claims, see, e.g., FAC ¶ 113
(alleging that CUTPA violation had "improper purpose and affect of abusing and causing
injury to the Connecticut judiciary system and their victims, which policies and practices
constituted abuse of process"), none of these allegations plausibly suggest an "improper
purpose," as the phrase has been interpreted by the Connecticut Supreme Court.
Weldon fails to allege any extraneous motivation defendants had for instituting the
foreclosure action.  See Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Inv'rs, L.P., 260
Conn. 766, 776 (2002) ("As examples of actions that might give rise to claims for abuse
of process, however, we listed, 'unreasonable force, excessive attachments or
extortionate methods . . . .'" (quoting Mozzochi v. Beck, 204 Conn. 490, 493 (1987))).
Most likely, this gesturing at abuse of process claims is a misguided—and
unsuccessful—attempt to head off application of the litigation privilege.

Having dispensed with Weldon's objections, the court turns to the applicability of
the litigation privilege to each of Weldon's claims.  Count III, for abuse of process, is not
barred by the litigation privilege.  The court declines to address the applicability of the
privilege to Count IV, for violations of the CCPA, given that it is subject to dismissal on
other grounds.  See infra Part IV.F.  Counts V and VI allege that defendants failed to
discharge the municipal tax liens on Weldon's home within the requisite amount of time.
See FAC ¶¶ 227, 235.  Because Counts V and VI do not purport to impose liability on
defendants for litigation-related communications, they too survive dismissal on privilege
grounds.

Count I, Weldon's conversion claim, makes clear that his theory for imposing
liability rests on Caz Creek's and MTAG's efforts "to collect and demand payment of

assigned tax liens, by filing and continuing to prosecute tax foreclosure lawsuits to collect the assigned tax liens."  See FAC ¶ 102.  As such, the wrongful conduct that Weldon puts forth as grounds for recovery is protected, litigation communication.  More specifically, efforts to collect on "liens that they did not own," see id. ¶ 102, are protected as communications made in the course of litigation.  Therefore, Count I is barred by the litigation privilege.

Similarly, Counts II.A and II.B rest on the contention that it was unfair and deceptive for MTAG and Caz Creek to assert, in court filings and in case-related communications, that they owned the municipal tax liens on Weldon's home.  See generally id. ¶¶ 108–24.  These assertions, whether or not they were untrue or dishonest, are absolutely privileged.

Counts II.C, II.D, and II.H suggest that it was unfair for defendants to demand and collect attorney's fees, costs, and post-charge-off fees and costs, respectively.  See id. ¶¶ 130, 140, 177.  Again, these attempts to impose liability on defendants for demands they made during and/or in furtherance of the underlying state foreclosure lawsuit are barred by the litigation privilege, whether or not they were in fact entitled to these payments.

Turning to Counts II.E, II.F,[14] and II.G, the court concludes that these claims are not barred by the litigation privilege.  Counts II.E and II.F both relate to the alleged impermissibility of instituting suit in violation of licensing requirements that apply to Consumer Collection Agencies operating in Connecticut.  See id. ¶¶ 149–51, 159–60.

---

[14] Because Count II.F was dismissed on standing grounds as to claims against Cazenovia, see supra Part IV.A.2.b, references to Count II.F in the remainder of this Ruling relate to the claim against MTAG, unless otherwise specified.

27

These claims do not seek to impose liability for communications uttered in the course of state litigation, but instead on the grounds that specific conduct—engaging in debt collection without a license, or in derogation of licensing requirements—was unlawful. Count II.G similarly argues that certain conduct—here, purchasing third party tax liens for the purpose of filing tax lien foreclosure suits—was unlawful.  See id. ¶¶ 168–69. Notably, this claim does not challenge any statement made in pursuance of litigation, but rather antecedent, allegedly unlawful purchasing practices.  Thus, Counts II.E, II.F, and II.G cannot be dismissed as barred by the litigation privilege.

Last, Weldon's claim for unjust enrichment is not barred by the litigation privilege. To be sure, some of the allegedly "unlawful and inequitable acts alleged in [the] Complaint concerning [the] demand and collection of municipal tax liens" are proscribed as bases for liability by the litigation privilege.  However, the court has determined that several of the claims in Weldon's FAC are not barred by the litigation privilege.  To the extent Weldon's claim for unjust enrichment is grounded in that other, potentially inequitable conduct, it survives dismissal on litigation privilege grounds.  See, e.g., supra at 27.

In summary, the court concludes that Counts I, II.A–D, and II.H are barred by the litigation privilege, while Counts II.E–G, III, V, VI, and VII are not.[15]

C.    Noerr-Pennington Doctrine

Defendants also move to dismiss Weldon's claims as barred by the Noerr-Pennington doctrine.  See generally MTAG Mem. in Supp. at 7–9; Caz Mem. in Supp.

---

[15] As noted above, see supra Part IV.B.2, the court does not address whether Count IV might be barred by the litigation privilege.

at 9 n.4 (incorporating by reference MTAG's arguments).  To a great extent, defendants'

arguments on this point overlap with their arguments as to the applicability of the

litigation privilege: they argue Noerr-Pennington provides First Amendment protection to

the commencement and pursuit of non-sham litigation.  See MTAG Mem. in Supp. at 7.

Weldon responds that the "sham" exception to Noerr-Pennington removes defendants'

allegedly abusive conduct from protection, just as that conduct is not covered by the

state litigation privilege.  See Opposition at 52 ("For the same reasons that state

litigation privilege does not provide any legitimate defense to Defendants, neither does

[Noerr-Pennington].").  As set forth below, most of Weldon's arguments against

application of the Noerr-Pennington doctrine are unpersuasive.  Therefore, the court

dismisses many of his claims on Noerr-Pennington grounds as well.

       1.    Governing Law

     The Noerr-Pennington doctrine was established in the antitrust context and

"derived from First Amendment principles guaranteeing the right to petition the

government."  Hartford Life Ins. Co. v. Variable Annuity Life Ins. Co., Inc., 964 F. Supp.

624, 626 (D. Conn. 1997).  Since the doctrine's origins in the 1960s and 1970s, "[c]ourts

have extended Noerr-Pennington to encompass concerted efforts incident to litigation,

such as prelitigation 'threat letters' and settlement offers."  Primetime 24 Joint Venture

v. Nat'l Broad., Co., Inc., 219 F.3d 92, 100 (2d Cir. 2000) (citations omitted).  "The

Noerr-Pennington doctrine [ ] protects allegedly false statements and statements that

fall far short of the ethical standards generally approved in this country."  Jackson Hill

Rd. Sharon CT, LLC v. Town of Sharon, 561 F. Supp. 2d 240, 245 (D. Conn. 2008)

(quotation marks and citations omitted).  The Second Circuit has concluded that CUTPA

and Connecticut common law claims must be interpreted—and would be interpreted by

Connecticut state courts—so as to avoid "serious constitutional problems."  See

Suburban Restoration Co., Inc. v. ACMAT Corp., 700 F.2d 98, 102 (2d Cir. 1983); see

also Uniroyal Chem. Co. v. Syngenta Crop Prot, Inc., No. 3:02 CV 2253(AHN), 2006 WL

516749, at *7 (D. Conn. Mar. 1, 2006) (ruling that Noerr-Pennington barred CUTPA

claim); Bath Petroleum Storage, Inc. v. Market Hub Partners, L.P., 229 F.3d 1135, 2000

WL 1508873, at *1 (2d Cir. 2000) (summary order) (noting Noerr-Pennington's

applicability to "state-law claims").

Although Noerr-Pennington provides broad protection for the commencement of

legal proceedings, and for communications related to it, so-called "sham" litigation is not

immune from liability.  "This exception applies where the litigation is (1) 'objectively

baseless' and (2) intended to cause harm to the defendant 'through the use [of]

governmental process-as opposed to the outcome of that process . . . .'"  T.F.T.F.

Capital Corp. v. Marcus Diary, Inc., 312 F.3d 90, 93 (2d Cir. 2002) (per curiam) (quoting

Prof'l Real Estate Inv'rs Inc. v. Columbia Pictures Indus., 508 U.S. 49, 60–61 (1993)).

    2.    Application of Noerr-Pennington to Weldon's Claims

As noted above, many of Weldon's arguments against applicability of the Noerr-

Pennington doctrine are recycled arguments against Connecticut's litigation privilege.

See Opposition at 52.  However, a few points of clarification—insofar as the arguments

differ in this context—are in order.

First, to the extent Weldon incorporates by reference any argument that

Cazenovia cannot invoke the Noerr-Pennington doctrine, those arguments fail.  The

great weight of authority suggests that third parties can invoke the protection of Noerr-

Pennington, subject to the normal requirement that the litigation not be a "sham."  See

Genworth Fin. Wealth Mgmt., Inc. v. McMullan, No. 3:09–CV–1521(JCH), 2012 WL

1078011, at *12 n.13 (D. Conn. Mar. 30, 2012) (collecting three circuit court cases);

12 Robert M. Langer et al., Connecticut Unfair Trade Practices, Business Torts and

Antitrust § 5.15 & n.38 (2015–2016 ed.) (collecting cases).

Second, the court rejects Weldon's arguments that the statutes under which he

has sued were enacted with the "purpose [of] redress[ing] litigation abuse."  See

Opposition at 52.  In brief, the court concludes once more that there is scant evidence

that CUTPA or sections 12-193, 36a-801, 36a-805(a)(3), and 36-805(a)(12) of the

Connecticut General Statutes were enacted to combat litigation abuse.  See supra

Part IV.B.2.  Again, however, the court declines to address whether the claims in

Count IV would be protected under the Noerr-Pennington doctrine.  See id.

To the extent Weldon incorporates by reference his argument that

communications predating the institution of the state suit as well as those not asserted

in court filings are unprotected, the court rejects it.  It is even more apparent in the

Noerr-Pennington context than it was for the litigation privilege that prelitigation

communications and other "concerted efforts incident to litigation" are protected.

Primetime 24 Joint Ventures, 219 F.3d at 100.

Last, the crux of Weldon's objection to applying the Noerr-Pennington doctrine is

that the state suit was a sham.  See Opposition at 51–52.  As a general matter, the

court rejects Weldon's argument that the state suit was "objectively baseless."  Weldon

offers two decisions from other courts in this circuit for the proposition that, when

lienholders who do not actually own a debt institute a state foreclosure suit, such suit is

per se "objectively baseless." See id. (discussing Sykes v. Mel Harris & Assocs., LLC, 757 F. Supp. 2d 413, 429 (S.D.N.Y. 2010); Fritz v. Resurgent Capital Servs., L.P., 955 F. Supp. 2d 163 (E.D.N.Y. 2013)).  First, as MTAG points out, see MTAG Reply at 2 n.2, the facts of Sykes are far different than those at issue in this case: there, the allegedly fraudulent scheme was "massive" and consisted of a debt-buying company "failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service," 757 F. Supp. 2d at 418.  Here, by contrast, there is no allegation of similar conduct.

Additionally, the court finds the reasoning of the court in Fritz unpersuasive or, at the very least, inapplicable to the facts of this case.  Although the defendant in Fritz worked in concert with the entity that owned the underlying debt, there is no indication that it ever owned the debt.  Judge Block's remark in Fritz that "[a] collection action by an entity that does not own the underlying debt is certainly 'objectively baseless'," see 955 F. Supp. 2d at 176–77, was thus penned in response to that readily distinguishable set of facts.  Moreover, without reaching the merits of their contentions, MTAG and the Caz Defendants have provided significant argumentation in support of the permissibility of MTAG's institution of the foreclosure suit as custodian for Caz Creek.  See MTAG Mem. in Supp. at 12–14; MTAG Reply at 4–5; Caz Reply at 1–2.  Though the court does not here decide whether their legal arguments are correct, they are clearly not utterly without merit, so as to render the institution of the foreclosure suit "objectively baseless."  Therefore, the court concludes that the foreclosure suit was not a "sham," such that it is beyond the scope of the Noerr-Pennington doctrine.

However, the court declines MTAG's invitation to dismiss Weldon's abuse of process claims under the Noerr-Pennington doctrine.  See MTAG Mem. in Supp. at 9. In a somewhat analogous case, the Second Circuit declined to affirm dismissal of an abuse of process claim on Noerr-Pennington grounds, where it was otherwise clear that the claim was without merit.  See T.F.T.F. Capital Corp., 312 F.3d at 94.  Because the court similarly concludes that dismissal on the merits is appropriate for Weldon's abuse of process claims, see infra Part IV.E, it declines to opine on the interaction between Noerr-Pennington's sham exception and abuse of process claims.

As was the case with defendants' litigation privilege arguments, Counts V and VI, which relate to timely discharges of the liens, have nothing to do with the institution or pursuit of litigation and so are not protected by Noerr-Pennington.

Though already dismissed on litigation privilege grounds, Count I, which relies on alleged misstatements by defendants as the basis for Weldon's conversion claim, is also barred by Noerr-Pennington.  See Jackson Hill Rd. Sharon CT, LLC, 561 F. Supp. 2d at 245.  Relatedly, Counts II.A and II.B seek to impose liability for institution of a lawsuit.  Having determined that the underlying state foreclosure lawsuit was not a sham, the court concludes that defendants' "right to file a lawsuit without liability [was] unimpeachable . . . ."  See Ginx, Inc. v. Soho All., 720 F. Supp. 2d 342, 363 (S.D.N.Y. 2010).

Counts II.C, II.D, and II.H suggest that demands for and collection of attorney's fees, costs, and post-charge-off costs are deceptive acts that can serve as the bases for CUTPA claims.  As was the case in the court's litigation privilege discussion, these core litigation communications are also protected by the Noerr-Pennington privilege.

Although Counts II.E and II.F were not dismissed on litigation privilege grounds, they are barred by the Noerr-Pennington doctrine. Count II.E offers Caz Creek's institution of lawsuits under a name not on its consumer collection agency license as the grounds for imposing liability under CUTPA. See FAC ¶¶ 149–50. Similarly, Count II.F suggests that MTAG's institution of suits without being licensed as a consumer collection agency was an unfair and deceptive practice, within the meaning of CUTPA. See FAC ¶¶ 159–60. Because they seek to impose liability on defendants for filing a lawsuit—an action absolutely protected in non-sham situations by Noerr-Pennington— the court concludes that Counts II.E and II.F must be dismissed.

Count II.G survives dismissal on Noerr-Pennington grounds, as it did on litigation privilege grounds, because it relates not to defendants' actual institution of lawsuits, but to their allegedly unlawful purchase of liens. See FAC ¶¶ 169. Such conduct not in immediate anticipation of litigation, cf. Primetime 24 Joint Venture v. Nat'l Broad., Co., Inc., 219 F.3d 92, 100 (2d Cir. 2000) (noting that prelitigation "threat letters" are protected by Noerr-Pennington), do not fall within Noerr-Pennington's purview.

Finally, the court refrains from dismissing Weldon's unjust enrichment claim (Count VII), for the same reasons set forth above. Namely, to the extent the unjust enrichment claim is grounded in unlawful conduct alleged in counts not dismissed on litigation privilege or Noerr-Pennington grounds, there is no reason Weldon should be barred from pursuing this equitable cause of action.

The court pauses, at this point, to summarize it's rulings in Part IV.B and Part IV.C as to each Count in Weldon's FAC: Counts I, II.A–D, and II.H are dismissed on both litigation privilege and Noerr-Pennington grounds; and Counts II.E–F are

dismissed on <u>Noerr-Pennington</u> grounds.  Counts II.G, III, IV, V, VI, and VII survive for

the various reasons set forth above.  Next, the court addresses each of the remaining

claims.

      D.      <u>Count II.G: CUTPA Claim Grounded in Purchase of Liens for Purpose of Filing Suit</u>

Defendants argue that Weldon's CUTPA claim in Count II.G should be dismissed

because, among other reasons,[16] they do not qualify as consumer collection agencies

within the meaning of the relevant statute cited in Count II.G.  <u>See</u> MTAG Mem. in

Supp. at 21–22; Caz Mem. in Supp. at 18 n.7; MTAG Reply at 8–9; Caz Reply at 6–7.

Weldon disputes this reading of the statute, arguing that defendants are consumer

collection agencies.  <u>See</u> Opposition at 26–29.

Weldon's CUTPA claim in Count II.G rests on defendants' allegedly unlawful

purchase of third party tax liens for the purpose of filing tax lien foreclosure lawsuits, in

violation of section 36a-805(3) of the Connecticut General Statutes.  <u>See</u> FAC ¶¶ 164–

72.  Section 36a-805 provides that "[n]o consumer collection agency shall . . .

(3) receive assignments as a third party of claims for the purpose of collection or

institute suit thereon in any court."  The term "consumer collection agency" is defined, in

relevant part,[17] as:

> any person (A) engaged as a third party in the business of collecting or receiving
> payment for others on any account, bill or other indebtedness <u>from a consumer</u>
> <u>debtor</u>, (B) engaged directly or indirectly in the business of collecting on any
> account, bill or other indebtedness <u>from a consumer debtor</u> for such person's

---

[16] Here, and throughout this Ruling, when the court determines that dismissal of a claim is proper for one reason, it does not address—and expresses no opinion as to the validity of—defendants' other arguments for dismissal.

[17] Weldon disclaimed reliance on section 36a-800(2)(C) of the Connecticut General Statutes, at least as far as MTAG is concerned.  Opposition at 27 n.13.

> own account if the indebtedness was acquired from another person and if the
> indebtedness was either delinquent or in default at the time it was acquired . . . .

Conn. Gen. Stat. § 36a-800(2) (emphasis added).  Thus, to qualify as a consumer

collection agency, the entity must be collecting a debt from a "consumer debtor," a term

that is itself defined by statute as: "any natural person, not an organization, who has

incurred indebtedness or owes a debt for personal, family or household purposes, . . .

[or] who has incurred indebtedness or owes a debt to a municipality due to a levy by

such municipality of a personal property tax . . . ."  Conn. Gen. Stat. § 36a-800(3).

Here, defendants were not acting as consumer collection agencies, because

Weldon is not a consumer debtor: his debt arose from a levy as a result of a real

property tax.  Contrary to Weldon's suggestion, see Opposition at 27, this conclusion is

not undermined by the lack of an explicit exclusion of real property tax liens from

Section 26a-800(3).  Indeed, the Connecticut Supreme Court has embraced the

expressio unius canon of statutory construction, whereby the legislature's expression of

one thing should be read as an exclusion of any unwritten, proffered terms.  See, e.g.,

Felician Sisters of St. Francis of Conn., Inc. v. Historic Dist. Comm'n of Town of Enfield,

284 Conn. 838, 850–51.  The definition of "consumer debtor" is therefore most logically

read as excluding municipal debts arising from real property taxes, such as those at

issue in this case.

Nor is Weldon's argument that he qualifies as a "consumer debtor" because

municipal property taxes are "personal" persuasive.  Though taxes on real property are

"debt[s] due from the person who holds title to the interest taxed," Town of Trumbull v.

Palmer, 104 Conn. App. 498, 509 (2007), the statutory framework as a whole

undermines the argument that municipal tax liens are "debt[s] for personal . . .

36

purposes," <u>see</u> Conn. Gen. Stat. § 36a-800(3).  Section 36a-800 distinguishes between the "consumer debtor" and the "property tax debtor."  The latter term is defined to clearly include people who incurred indebtedness as a result of a real property tax.  <u>See</u> Conn. Gen. Stat. § 36a-800(11) (defining "property tax debtor"), § 36a-800(10) (defining "property tax" by reference to section 7-560 of the Connecticut General Statutes); Conn. Gen. Stat. § 7-560(17) (including "all taxes on real and personal property levied by the municipality").  Interpreting Section 36a-800(3)'s definition of consumer debtor to include those in Weldon's situation would subsume all property tax debtors within the broader category of consumer debtors.  In other statutory provisions, the legislature has listed consumer and property tax debtors individually, <u>see, e.g.</u>, Conn. Gen. Stat. § 36a-805(a)(2), which would be entirely unnecessary under Weldon's suggested construction of the statute.  The court's reading of Section 36a-800(3) has also been embraced by at least one court.  <u>See generally</u> <u>City of New Haven v. Bonner</u>, No. CV030477379, 2003 WL 22792241 (Conn. Super. Ct. Nov. 10, 2003), <u>rev'd in part on other grounds</u>, 272 Conn. 489 (2005).  There, the court explicitly determined that the defendant, who owed money on "tax liens secured by real property," <u>see id.</u> at *1, was a property tax debtor, rather than a consumer debtor, <u>see id.</u> at *2.

Therefore, based on the statutory framework defining and governing the operation of consumer collection agencies, the court concludes that defendants do not qualify as such, based on their interactions with Weldon.[18]  They therefore were not

---

[18] The court is aware that Caz Creek is licensed as a consumer collection agency.  <u>See</u> FAC ¶¶ 6.  Yet whatever the nature of its business otherwise, Caz Creek was not acting as a consumer collection agency within the meaning of the statutes when it brought suit against Weldon, because Weldon was not a consumer debtor.

subject to Section 36a-805(3), and Weldon's CUTPA claim relying on violations of that statute fails.  Defendants' Motions to Dismiss Count II.G are therefore granted.

      E.    <u>Count III: Abuse of Process</u>

With regard to Count III, defendants urge dismissal on the grounds that Weldon has not properly alleged any "collateral objective," as required for an abuse of process claim.  <u>See</u> MTAG Mem. in Supp. at 18–19; <u>see also</u> Caz Mem. in Supp. at 26–30; MTAG Reply at 7–8; Caz Reply at 8.  Weldon responds that he has sufficiently alleged that defendants filed tax foreclosure lawsuits "not for the proper purpose of receiving lawful judgments, but rather to coerce Plaintiff and others to pay monies . . . not owed to them."  Opposition at 36.  Alternatively, he suggests that abuse of process claims implicate factual issues, such that the court should not dismiss Count III at this stage of the litigation.  <u>See</u> Opposition at 37.

"An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed."  <u>Larobina v. McDonald</u>, 274 Conn. 394, 403 (2005) (quoting <u>Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Invs., L.P.</u>, 260 Conn. 766, 772–73 (2002)).  Crucially, the tort "arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process."  <u>Id.</u>  Moreover, the underlying suit must be intended "<u>primarily</u> to accomplish a purpose for which it is not designed."  <u>MacDermid, Inc. v. Leonetti</u>, 310 Conn. 616, 634 (2013) (quoting <u>Mozzochi v. Beck</u>, 204 Conn. 490, 497 (1987)).  Impermissible collateral purposes include "us[ing] the pleadings or the process . . . as leverage to coerce the plaintiff to pay a debt or surrender property unrelated to that litigation . . . us[ing] unreasonable force, excessive attachments or

extortionate methods . . . [or] pursu[ing] the [ ] case [ ] to gain [a] collateral advantage extraneous" to the merits of the case.  <u>Mozzochi</u>, 204 Conn. at 493–94.

The theory undergirding Weldon's abuse of process claim is that defendants' institution of tax lien foreclosure lawsuits was coercive, such that the suit was not instituted for the purposes for which it was designed.  This argument is fundamentally flawed.  Whatever unfairness may arise from financial disparities among parties, <u>see generally</u> Albert Yoon, <u>The Importance of Litigant Wealth</u>, 59 DePaul L. Rev. 649 (2010), instituting a tax lien foreclosure lawsuit in the hopes that a homeowner will pay the debt and obviate the need for the lawsuit, is an end for which tax lien foreclosure suits are designed.  Whether Weldon chooses to label the state legal proceedings in which he was involved "coercive," he, like all litigants, had the choice to settle or continue the lawsuit.  When a plaintiff alleges that the underlying lawsuit is "without merit," or that the pleadings in the prior suit contained allegations known to be false, these allegations are not sufficient to sustain an abuse of process claim.  <u>See</u> <u>Mozzochi</u>, 204 Conn. at 493, 497–98.  Without any allegation of the type of misconduct identified in <u>Mozzochi</u>—including using a lawsuit "to coerce the plaintiff to pay a debt or surrender a property <u>unrelated to that litigation</u>," 204 Conn. at 493 (emphasis added)—Weldon's claim for abuse of process fails.

Nor is Weldon's argument that the court should refrain from dismissing Count III, so as to wait for more evidence as to factual issues in the case, persuasive.  Federal Rule of Civil Procedure 12(b)(6) and the case law interpreting it make clear that a plaintiff must plead sufficient factual allegations, before he can continue to discovery.  <u>See</u> <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) ("'Where the

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,' [ ] dismissal is appropriate." (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009)).  The court has determined that, even taking all factual allegations in his complaint as true, Weldon has failed to offer any improper purpose of the underlying state foreclosure litigation sufficient to plausibly state a claim of abuse of process. Therefore, defendants' Motions to Dismiss Count III are granted.

      F.    <u>Count IV: CCPA Violations</u>

Defendants offer several possible grounds for dismissal of Weldon's CCPA claims set forth in Counts IV.A–C.  <u>See generally</u> MTAG Mem. in Supp. at 23–27; Caz Mem. in Supp. at 22–24; MTAG Reply at 9.  However, the court need only address one of the arguments raised in MTAG's Motion to Dismiss, namely that municipal tax liens do not qualify as a debt within the meaning of the CCPA.  <u>See</u> MTAG Mem. in Supp. at 24.  Weldon does not offer any rebuttal.  <u>See</u> Opposition at 34–35; MTAG Reply at 9 ("Plaintiff wholly ignores MTAG's argument that municipal tax liens are not 'debts' within the meaning of the statute.").

The CCPA provides that "[a] creditor . . . who uses any abusive, harassing, fraudulent, deceptive or misleading representation, device or practice with respect to any person to collect or attempt to collect a debt in violation of section 36a-646 . . . or the regulations adopted pursuant to section 36a-647 . . . shall be liable" for damages. Conn. Gen. Stat. § 36a-648(a).  Both "creditor" and "debt" are terms defined by statute. A "debt" is defined as "an obligation or alleged obligation arising out of a transaction in which the money, property, goods or services which are the subject of the transaction

are for personal, family or household purposes, whether or not such obligation has been reduced to judgment." Conn. Gen. Stat. § 36a-645(3).[19]

"The CCPA's terms are substantially parallel to the [Fair Debt Collection Practices Act], except the CCPA governs the collection practices of creditors, not debt collectors." Vallecastro v. Tobin, Melien & Marohn, No. 3:13–cv–1441 (SRU), 2014 WL 7185513, at *5 (D. Conn. Dec. 16, 2014). Indeed, the CCPA has been described as "a version of the [f]ederal Fair Debt Collection Practices Act (FDCPA)." Vasquez v. Karjanis & Sons Motors, LLC, No. NNHCV116021120S, 2012 WL 6965392, at *10 (Conn. Super. Ct. Dec. 21, 2012). Because a private cause of action has only been available under the CCPA since 2007, "courts often consider and cite as persuasive authority cases decided under the federal [FDCPA] because the [CCPA] parallels the FDCPA." Claude v. Wells Fargo Home Mortg., No. 3:13–cv–535 (VLB), 2014 WL 4073215, at *7 n.5 (D. Conn. Aug. 14, 2014) (quotation marks and citation omitted).

Crucially, for the purposes of this Ruling, the statutory definition of "debt" in the CCPA is substantially identical to the definition in the FDCPA. Compare Conn. Gen. Stat. § 36a-645(3), with 15 U.S.C. § 1692a(5). The Second Circuit recently reaffirmed its prior holding that "municipal taxes levied automatically in connection with ownership of personal property do not involve a 'transaction' as that term is understood under the FDCPA and, accordingly are not 'debt' for the purposes of the FDCPA." Boyd v. J.E. Robert Co., Inc., 765 F.3d 123, 126 (2d Cir. 2014) (per curiam) (discussing Beggs v.

---

[19] The "Definitions" section of the CCCPA applies only to "sections 36a-645 to 46a-647 inclusive." Conn. Gen. Stat. § 36a-645. Yet the definition of a "debt" set forth therein is still applicable to Weldon's damages claim arising under section 36a-648(a) of the Connecticut General Statutes, because that provision simply provides a damages remedy for underlying violations of sections 36a-646 and 36a-647, to which the statutory definition of "debt" clearly applies.

Rossi, 145 F.3d 511, 512 (2d Cir. 1998) (per curiam)).  The relationship between "taxpayer and taxing authority . . . does not encompass that type of pro tanto exchange which the [FDCPA's] statutory definition [of a 'debt'] envisages."  Id. at 126 (2d Cir. 2014) (quoting Beggs, 145 F.3d at 512).

Given courts' frequent use of case law interpreting the FDCPA as persuasive authority in interpreting the CCPA, the court similarly concludes that the municipal tax liens at issue here do not qualify as "debts" within the meaning of the CCPA.  Thus, because defendants were not collecting on a "debt," their actions are not actionable under section 36a-648 of the Connecticut General Statutes.  Counts IV.A, IV.B, and IV.C are therefore dismissed in their entirety, and the court need not address defendants' other arguments for dismissal of these Counts.

G.   Count V: Lien Discharge Claim for Violation of Sections 12-195g, 42a-9-513, and 42a-9-625 of the Connecticut General Statutes

Defendants argue that Count V should be dismissed, because the statutory provision under which Weldon purports to raise his claim does not apply to real property tax liens.  See generally Caz Mem. in Supp. at 30–31; MTAG Mem. in Supp. at 29–30; MTAG Reply at 10; Caz Reply at 8–9.[20]  Weldon counters that section 12-195g of the Connecticut General Statutes ("Section 12-195g"), which requires lien discharge within a prescribed amount of time, does apply to real property tax liens.

Section 12-195g applies only to "lien[s] created under sections 12-195a to 12-195g [of the Connecticut General Statutes], inclusive."  It mandates that, when such

_____

[20] Because the court concludes that section 12-195g of the Connecticut General Statutes does not apply to tax liens on real property, see infra at 42, it expresses no view on the Caz Defendants' alternative argument that section 12-195g lacks a private right of action, see Caz Mem. in Supp. at 30–31, or on MTAG's argument that the ten-day discharge requirement does not apply here, see MTAG Mem. in Supp. at 29 n.11.

42

liens are "discharged," "a certificate of discharge shall promptly be filed." Id. The only type of liens created under sections 12-195a to 12-195g of the Connecticut General Statutes is personal property tax liens. See Conn. Gen. Stat. § 12-195b(a) (providing for creation of "a lien . . . upon [ ] goods" if "any personal property tax . . . due any municipality is not paid within the time limited by any local charter or ordinance"). In contrast, section 12-195h of the Connecticut General Statutes explicitly pertains to "liens filed by the tax collector to secure unpaid taxes on real property."

It is abundantly clear that the liens subject to the requirements of Section 12-195g are expressly limited to those created under sections 12-195a through 12-195g. See Conn. Gen. Stat. § 12-195g. Whatever merit defendants' invocation of section 12-195h elsewhere in their Motions may have, the statute under which Weldon brings Count V, by its own terms, does not pertain to real property tax liens.[21] The court agrees with Weldon's contention elsewhere in his Opposition that it should "apply[ ] the plain and rational meaning of the statute." See Opposition at 31. Doing so here, the

_____

[21] Weldon's invocation of the Superior Court decision in Jreige, LLC v. O'Leary Ltd. P'ship, No. CV075012781, 2009 WL 242374 (Conn. Super. Ct. Jan. 7, 2009), is inapposite. The primary question at issue in that case was whether the City of Hartford had validly assigned certain tax liens to the foreclosing plaintiff. See id. at *1. First, contrary to defendants' interpretations, see MTAG Reply at 10; Caz Reply at 8–9, the tax liens at issue likely were real property liens, see Jreige, 2009 WL 242374, at *1 (referencing possibility of "foreclos[ing] on property"). The Caz Defendants erroneously suggest that the property at issue was worth $20,000, see Caz Reply at 9; rather, it was only the tax liens assigned to plaintiff in the case that were worth $20,000, see Jreige, 2009 WL 242374, at *1. This conclusion is further buttressed—and Weldon's argument for the case's relevance further diminished—by the court's mistaken citation to section 12-195b, rather than section 12-195h, of the Connecticut General Statutes. See id. at *1. Section 12-195b does not contain the language quoted by the court, whereas Section 12-195h contains the relevant language and addresses the question at issue in the court's ruling. Therefore, when properly interpreted, Jreige does not stand for the proposition that any of the statutory provisions from section 12-195a to 12-195g of the Connecticut General Statutes "have been applied to foreclose on municipal tax liens involving real property . . . ." See Opposition at 38. Weldon has offered no other case law to support this assertion that appears, for the reasons set forth in the text immediately preceding this footnote, contrary to the statutory language.

court concludes that the plain language of the statute renders Weldon's argument that Section 12-195g applies to real property tax liens without merit.

      H.    <u>Count VI: Lien Discharge Claim for Violation of Section 49-8 of the Connecticut General Statutes</u>

The court has already rejected defendants' arguments that Weldon does not have Article III standing to assert his claim articulated in Count VI.  <u>See</u> <u>supra</u> Part IV.A.1.  Because defendants have suggested no other grounds on which dismissal would be appropriate, <u>see generally</u> Caz Mem. in Supp. at 31–32; MTAG Mem. in Supp. at 27–29, the court denies their Motions to Dismiss Count VI.

      I.    <u>Count VII: Unjust Enrichment</u>

Finally, the court addresses defendants' arguments for dismissing Weldon's unjust enrichment claim.  MTAG argues that dismissal is appropriate because: (1) its conduct was permitted by Connecticut law, and so the payments it received were in no way "unjust"; (2) Weldon has not alleged that he conferred a benefit on MTAG, as opposed to the Caz Defendants; and (3) there is no dispute that Weldon owed the tax liens, and paid the money at issue in this case to resolve his liability on the now-released liens.  <u>See</u> MTAG Mem. in Supp. at 19–21; <u>see also</u> MTAG Reply at 8.  The Caz Defendants join in the last of these arguments.  <u>See</u> Caz Mem. in Supp. at 32–33; <u>see also</u> Caz Reply at 9.  Weldon responds that defendants acted unlawfully and thus the payments it received were "unjust," that MTAG was enriched notwithstanding its citation to inapposite New York case law, and that it is no defense to an unjust enrichment claim that Weldon did in fact owe money on the tax liens.  <u>See</u> Opposition at 38–40.  Alternatively, Weldon argues that unjust enrichment claims rely on fact issues,

such that resolution of those questions is inappropriate on a motion to dismiss.  See id. at 39–40.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  BHP Land Servs., LLC v. Seymour, 137 Conn. App. 165, 170 (2012) (quoting Rent-A-PC, Inc. v. Rental Mgmt., Inc., 96 Conn. App. 600, 604–05 (2006)).  "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."  Vertex, Inc. v. City of Waterbury, 278 Conn. 557, 573 (2006) (quoting Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282–83 (1994)).

Here, Weldon's argument fails on the second prong set forth above: defendants effectively paid Weldon for the benefits they received.  Weldon contends that the benefit he conferred upon defendants was the substantial money he paid to bring the state foreclosure lawsuit to an end.  See Opposition at 40.  Yet he ignores the fact that he— perhaps belatedly—received precisely the benefit for which he paid: extinguishment of the municipal tax liens on his home.  As discussed above, see supra Part IV.E, the fact that Weldon may now believe he paid more money than he should have to settle the state suit is irrelevant.  He paid that money for lien discharges, and he received lien discharges.  There can therefore be little doubt that defendants "paid" Weldon for the financial benefit they received.

Moreover, Weldon's suggestion that the court refrain from dismissing this claim on a Motion to Dismiss is unavailing.  The passage he quotes as support for this proposition, see Opposition at 39–40, omits the end of the sentence from which it is taken.[22]  In its entirety, it reads: "Furthermore, the determinations of whether a particular failure to pay was unjust and whether the defendant was benefitted are essentially factual findings for the trial court that are subject only to a limited scope of review on appeal."  Hartford Whalers, 231 Conn. at 283 (emphasis added to indicate omitted text). The quoted language speaks to the standard of review appellate courts apply to lower court dismissals, rather than to any broader proscription on dismissing unjust enrichment claims.  Cf. Lawrence v. Richman Grp. Capital Corp., No. 303CV850JBA, 304CV166JBA, 2005 WL 3448056, at *5 (D. Conn. Dec. 15, 2005) (dismissing unjust enrichment cause of action for failure to state a claim on which relief could be granted). In any event, there are no "fact issues" related to the unjust enrichment claim, see Opposition at 40, that would benefit from further development.  Weldon makes clear that the liens on his home were discharged, in exchange for the money he paid to defendants.  See FAC ¶¶ 83–84; Opposition at 8–9.

Therefore, the court concludes that Weldon has not alleged a plausible claim for unjust enrichment and grants defendants' Motions to Dismiss Count VII.[23]

---

[22] Weldon not only failed to include the highly relevant language from this sentence, making the portion he quoted misleading: he also failed to place ellipses after the word "court" to signal that language was omitted from the quoted sentence.  This is unacceptable conduct by counsel.

[23] The court also notes the somewhat peculiar result that would arise if it agreed with Weldon that "[i]t would be inequitable and unjust for [d]efendants to retain any portion of the money paid by [p]laintiff." See FAC ¶¶ 245.  In prevailing on an unjust enrichment claim, Weldon would receive the benefit of the liens on his home having been discharged, while receiving as damages money he indisputably owed on those liens.  See Caz Mem. in Supp. at 32–33.

46

**V.      CONCLUSION**

For the reasons set forth above, the two pending Motions to Dismiss (Doc.

Nos. 59, 61) are **GRANTED IN PART AND DENIED IN PART**.  Counts I, II.A–D, and

II.H are dismissed on both litigation privilege and Noerr-Pennington grounds, while

Counts II.E–F are dismissed on Noerr-Pennington grounds.  Count II.F, insofar as it

brings claims against Cazenovia, is dismissed for lack of standing.  Count II.G is

dismissed because defendants are not consumer collection agencies, and Count III is

dismissed because he failed to allege that defendants instituted the state foreclosure

suit for any collateral purpose.  Counts IV.A–C are dismissed because the municipal tax

liens at issue in this case do not qualify as debts within the meaning of the CCPA, and

Count V, similarly, is dismissed because section 12-195g of the Connecticut General

Statutes does not apply to municipal tax liens on real property.  Last, Count VII is

dismissed for failure to plausibly state an unjust enrichment claim, where it is

undisputed that Weldon's liens were discharged in exchange for the payment he made

to defendants.

Defendants' Motions to Dismiss Count VI on Article III standing grounds are

denied.  Count VI is the only claim that survives this Ruling.

The court's previous stay of class merits discovery, see Scheduling Order

Regarding Case Management Plan (Doc. No. 65) at 1, is hereby terminated.  The

parties are directed to confer and to inform the court within 14 days from the entry of

this Ruling whether they believe any modifications to the court's Scheduling Order (Doc.

No. 65) are called for.

**SO ORDERED.**

Dated at New Haven, Connecticut this 28th day of February, 2017.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge